DES MOINES SAVINGS BANK, Guardian, Appellee, v. ZORA M. KRELL, Appellee, BANKERS SURETY COMPANY et al., Appellants.

**GUARDIAN AND WARD:** Accounting and Settlement—Expenditures for Guardian's Benefit—Discretion of Court.  The probate court possesses such wide discretion in settling the accounts of a

guardian that it may be justified, under appealing circumstances, such, for instance, as those of a destitute mother acting as guardian of, and caring for, her immature minor children, in crediting the guardian for reasonable expenditures which were wholly or in part for the guardian's personal benefit. So *held* where expenditures for clothing, etc., *for the guardian* were approved.

**GUARDIAN AND WARD:** Accounting and Settlement—Improvident
2 **Loans—Liability of Guardian.** A guardian is liable for such negligence in the loaning of the ward's estate as results in loss. Guardian held derelict in the making of certain improvident loans, and she and the surety ordered to make good the loss.

**GUARDIAN AND WARD:** Accounting and Settlement—Ex Parte
3 **Approval of Annual Reports—Effect.** The *ex parte* approval by the court of the annual reports of guardians does not constitute a conclusive adjudication of the correctness and propriety of the expenditures therein stated. At best, such approval has no greater effect than prima-facie evidence of accuracy of such accounts.

**GUARDIAN AND WARD:** Bonds—Discharge of Surety—Scope and
4 **Effect.** The *ex parte* release and discharge of a surety, obtained under Section 1177-b, Code Supp., 1913, effects only a discharge *for future acts*, even though aided by a formal order of discharge. (See also Sec. 1285, Code, 1897.)

**GUARDIAN AND WARD:** Bonds—Secondary Liability of Succeed-
5 **ing Sureties.** Whether a surety is secondarily liable for a dereliction occurring during the term of a prior surety, *quaere*.

**COSTS:** Taxation—Taxation to Successful Party. Costs may not
6 be taxed to a wholly successful party.

*Appeal from Polk District Court.*—Hugh Brennan, Judge.

WEDNESDAY, MARCH 15, 1916.

REHEARING DENIED WEDNESDAY, JUNE 28, 1916.

PROCEEDINGS in probate upon the final report and discharge of Zora M. Krell (formerly Zora M. Hahnen) as guardian of her two minor children. Exceptions were filed to her report by Des Moines Savings Bank, as guardian for the same wards, having been duly appointed as such upon the resignation of the mother. Upon the hearing of such exceptions, her sureties upon successive bonds appeared and made

defense.   Each surety company also denied liability for any dereliction, if any, that might be adjudged against the guardian.   The trial court overruled many of the exceptions presented by the plaintiff.   It sustained plaintiff's exceptions to the extent that it found the former guardian to have been derelict as to a worthless loan of $1,800 at one time, and again as to another worthless loan to the same borrower to the amount of $237.   The guardian was ordered to pay over such amounts with interest from the date of the loans, and the sureties were held liable therefor, as will be later explained more in detail.   From the order overruling its exceptions, the plaintiff has appealed.   From the order finding the guardian liable for the items of $1,800 and $237 and finding the surety companies liable therefor, the surety companies (three in number) have each appealed.   Mrs. Krell has not appealed. —*Modified* and *Affirmed.*

*B. J. Cavanagh,* for Bankers Surety Company; *E. D. Samson,* for American Surety Company of New York; *Dunshee & Haines,* for Lion Bonding & Surety Company, appellants.

*Brammer, Lehmann & Seevers,* for Des Moines Savings Bank, appellee.

*A. G. Rippey,* for Zora M. Krell, appellee.

EVANS, C. J.—The guardian whose accounts are under investigation was formerly Mrs. Zora M. Hahnen, the widow of H. F. Hahnen, who died in February, 1911, leaving surviving him such widow and their two minor children, Gretchen and Robert, aged respectively eleven and five years.   $9,000 came into the hands of the guardian as the proceeds of a life insurance policy in favor of the children.   In March, 1911, she was appointed guardian, her bond being fixed at $9,000. The defendant Bankers Surety Company became the surety on her bond for an agreed compensation of $36 per year. The conditions of the bond authorized the surety company to

take joint control with the guardian of the money of the wards in her hands. At the expiration of one year, the Bankers Surety Company took steps under the statute to be relieved from the further liability of such surety. Such proceedings were consummated about April 15, 1912, and a formal order was entered, discharging such surety company from further liability on its bond. On the same date, the defendant American Surety Company became surety for the guardian upon a bond of $9,000, and this also was for a compensation of $36 per year, and upon the same conditions as to joint control as the bond of the previous surety company. At the end of one year, this company also took steps under the statute to relieve itself from further liability as surety, and instituted proceedings to that end. A formal order was entered on June 17, 1913, purporting to fully discharge such company from further liability. Prior to this time, and at the expiration of the first year of suretyship of the American Surety Company, the court had reduced the penalty of the bond to be thereafter required of the guardian to the sum of $2,500, and authorized her to procure a new bond in such sum. Such bond was procured from the defendant Lion Bonding & Surety Company as surety on April 23, 1913. In September, 1914, the mother resigned as guardian and the plaintiff herein was appointed in her stead, and the issue was made upon her final report, as already indicated. The mother, therefore, controlled the estate of her wards for a period of about three years and a half. She made annual reports. These reports were approved from time to time without contest. A multitude of items enter into the dispute now presented, but we shall not undertake to deal with them in detail. So far as mere expenditures were concerned, the principal of the estate had been reduced approximately $1,000. The estate was further impaired to the extent of about $2,100 in bad loans, as already indicated. On the appeal of the plaintiff, we have to consider whether the trial court properly approved the expenditures reported by the mother guardian and properly

approved the diminution of the principal fund to the extent of about $1,000 in three years and a half. And we proceed first to a consideration of plaintiff's appeal.

I. Needless to say that the hearing upon this report was in probate and that the order of the trial court thereon will not be lightly disturbed. Not only has the finding of fact of the probate judge in such a case the force and effect of a verdict, but there is a degree of sound discretion that enters into the judgment of the probate court as to the nature and extent of expenditures which may be properly approved in a given case. The salient complaint of the plaintiff at this point is that many items of the mother's report were such as pertained to herself personally and should have been paid out of her personal estate, and that they were not expenses incurred on behalf of the children, and that they were therefore not properly chargeable to the estate of the children. For instance, there were charges for dry goods and for groceries, some of which, at least, must have been used by the mother herself. Some items of clothing are shown to have been purchased exclusively for the mother. There was one item of charge for a bed. Two beds had been bought previously. It is argued that two beds were sufficient for the children and that the third bed should not have been bought at their expense or charged to their account. This will indicate the general nature of the items complained of and the general nature of the complaint made.

1. GUARDIAN AND WARD: accounting and settlement: expenditures for guardian's benefit: discretion of court.

The general legal propositions urged by the plaintiff at this point are quite unassailable. It is doubtless true, as a general proposition, that the estate of these children cannot properly be charged with expenditures which do not fairly operate to the benefit and best interest of the children themselves. Even then, it does not necessarily follow that the expenditures must be confined to food actually consumed or clothing actually worn by the wards. The case before us is illustrative of the exceptional circumstances which may prop-

erly call for a considerable discretion on the part of the probate judge as to the nature and scope of the expenditures which may be properly approved. The case is one where there was no bad faith on the part of the mother and no lack of effort on her part to do her utmost in behalf of her children. What have sometimes been called "fireside equities" appear as a background to those facts which more directly concern the court. The deceased husband was in his lifetime a bank clerk, receiving a salary of from $150 to $160 a month. A few years before his death, his wife, this guardian, brought to him out of her mother's estate an inheritance of $15,000. When he died, the only property left by him was a little household furniture and an equity in the homestead of the value of $125. This equity was sold for such sum and two-thirds thereof passed to the credit of the children. Insurance inured to the benefit of the children to the extent of $9,000, and to the benefit of the widow to the extent of $2,000. The $2,000 of the widow was all paid out within a few months in the payment of the debts of the deceased, many, if not all, of which were for family expenses and for funeral and hospital expenses and the expenses of the last sickness. Within a few months following the death of her husband, the guardian was compelled to go to the hospital and submit to a major surgical operation, which took the remnant from her purse and necessarily left her in a more or less enfeebled condition. During this period of time, she hired the care, board and lodging of the children at a hotel. She did likewise in an attempt to pursue employment for the purpose of earning a living. She was between two alternatives. One was to seek permanent employment and to hire someone else to care for her children. The other was to abandon employment and devote herself to the care of her children. Under the approval of the probate court, she adopted the latter course. It necessarily involved more or less expenditure of the estate of the children in the support of the mother while she was rearing them. She had no estate of her own. She had no means of

making a living that would be consistent with her care of her children. We think it was within the sound discretion of the probate court to find that the best interests of the children required that they should be in charge of their mother and that she should make a home for them as far as she could; and, in the absence of any estate owned by the mother, that the expenditures of such an arrangement, within reasonable limits, should be paid by the estate of the children. We would not make light of the duties of parents as guardians to conserve the estates of children which may come into their hands; nor would we absolve them from the duty of bearing for themselves the ordinary burdens and expenditures of their own families where they have the ability or the means to do so. And this rule is especially applicable where the estate of the parent is considerable and the estate of the child is comparatively small. It does not follow, by any means, that a child and its parent must be held to poverty and dangerous privation during the years of its minority in order to preserve intact a considerable estate of such child, when the best interests of such child require that a home be maintained for it by the parent. In the administration of such a trust under such circumstances, we know of no better or safer rule of reason on the one hand, or of restraint on the other, than the sound discretion of the probate court in the light of all the circumstances of the case. We think that the discretion of approval which was exercised in the case exhibited by this record was within proper bounds, and furnishes no just ground for our interference.

II. The trial court found that there was dereliction on the part of the guardian in the making of a loan of $1,809 on April 1, 1912, to Earl Krell. The court found also that this loan resulted in loss to the estate to that extent. The trial court also found that, in August of that same year, she was again guilty of dereliction in loaning to the same borrower the sum of $237. It is urged, how-

2. GUARDIAN AND WARD: accounting and settlement: improvident loans: liability of guardian.

ever, by the surety companies that Krell repaid the loan of $1,809, together with interest thereon, in August, 1912, and that, therefore, this dereliction resulted in no loss. It is undisputed that Krell did execute and deliver his check to the guardian for $1,863 and that this check was subsequently paid by the bank on which it was drawn. This, however, is only a part of the story. At the time this check was executed and delivered, Krell had no credit to his account in the bank in excess of $1.91. On the same day that he delivered his check for $1,863 to the guardian (who, since April 1st, had become his wife), she executed to him her check, as guardian, for $2,100. Before the check for $1,863 was presented for payment at the drawee bank, Krell deposited the $2,100 check to the credit of his account, for the purpose of meeting the same. The net effect, therefore, of the transaction between the then husband and wife was that she loaned Krell an additional $237. This was the conclusion of the trial court, and we think it was correct.

It is urged for the surety companies that these loans appeared in the annual reports of the guardian and that they had been approved, and that such approval amounted to a conclusive adjudication. We have heretofore

3. GUARDIAN AND WARD: accounting and settlement: *ex parte* approval of annual reports: effect.

held that the approval of current annual reports has no "greater effect than prima-facie evidence of accuracy of the account as stated therein." *Kimble v. Dailey*, 127 Iowa 665; *Warfield v. Warfield*, 74 Iowa 184. We think it clear that the trial court was not precluded from going into the merits of the issue at this point, by reason of the previous approvals of annual reports. Our conclusion, therefore, at this point is that the order of the trial court finding dereliction as to these two loans must be sustained.

III. As already indicated, the first surety upon the guardian's bond was the Bankers Surety Company, one of the appellants herein. It became surety in March, 1911, and collected premiums for one year. On April 11, 1912, it

obtained an order from the probate court purporting to exon-
erate and release it "from all further duties
4. GUARDIAN AND
WARD: bonds:     and all obligations and responsibilities which
discharge of
surety: scope    may hereafter arise," etc.   The claim on be-
and effect.
half of this company is that the effect of this
order was to terminate all liability, whether future or *past*.
For the plaintiff, it is contended that the utmost effect of
such an order would be to discharge the surety from further
liability for the future acts of the guardian.   The proceedings
adopted by the surety company to obtain its release were those
provided by Section 1177-b, Code Supp., 1913.   Sections
1177-a, 1177-b, and 1177-c are as follows:

"Sec. 1177-a.   When a bond is required by law to be
given by or for any public officer, deputy or employe of such
public officer, or by any person holding a fiduciary office or
trust, administrator, executor, guardian, trustee, officer or
employe of any public or private corporation or association,
when not otherwise specifically provided, [it] shall be con-
ditioned as provided in Section 1183 of the Code.

"Sec. 1177-b.   If any surety on said bond shall so elect,
his liability thereon may be canceled at any time by giving
thirty days' notice in writing to the person or persons author-
ized to approve said bond, and to the officer or person with
whom the same is required to be filed or deposited by law, and
refunding the premium paid, if any, less a pro rata part
thereof for the time said bond shall have been in force.   The
liability and indemnity created by said bond shall extend to
the date of cancellation as provided by Chapter 11, Title VI
of the Code.

"Sec. 1177-c.   No contract, stipulation, or condition limit-
ing the liability created by said bond shall be of any force or
validity."

It is contended for the surety company that it proceeded
in pursuance of the section above quoted and that it obtained
from the court a formal order of discharge, which amounts to
a complete adjudication of its liability.   It will be noted that

this Section 1177-b provides the method by which a discharge may be obtained by a surety at its own election, and it provides, also, the scope and effect of such discharge. There is no provision therein for any court procedure. Even if we treat such procedure as being within the jurisdiction of the court, the order of the court must, nevertheless, be read in the light of the statute. Section 1177-b provides that the "liability and indemnity created by said bond shall extend to the date of cancellation as provided by Chapter 11, Title VI of the Code."

Chapter 11, Title VI, of the Code, comprises Sections 1280 to 1288, inclusive. This chapter, originally and on its face, pertains only to sureties on bonds of public officers. By the reference contained in Section 1177-b, a part at least of Chapter 11 becomes incorporated in such section by such reference. Section 1285 in such Chapter 11, among other things, provides:

"Upon such new bond being given, the petitioning surety . . . shall be declared discharged from liability on the same *for future acts.*"

We think it clear that there is nothing in the statute providing for the release of sureties which authorizes or contemplates a release of liability except "for future acts." It will be noted that Section 1177-b provides for a pro rata refunding of the premium paid. This implies that a part of the premium may be properly retained. This is necessarily upon the assumption that some liability has been incurred in the past for which a premium may be properly retained. Upon a consideration, therefore, of the statute alone, we think it quite clear that the Bankers Surety Company was not relieved from liability accrued by reason of dereliction already done on the part of the principal; nor is there any means provided in the statute whereby the surety company can institute litigation in advance of complaint by the aggrieved party and thus adjudicate that question. In other words, having

incurred the liability, such liability continues during the period of the statute of limitations, unless sooner litigated by or on behalf of the aggrieved party. We so held, in effect, in *Ellyson v. Lord*, 124 Iowa 125. Some reliance is placed at this point on *Bankers Surety Company v. Wyman*, 141 Iowa 574. The cited case, however, involved an entirely different question from that presented here, both as to its facts and as to the statute involved. The statutory section involved in that case was Section 3268, Code, 1897. The original proceedings in that case disclosed that the suretyship of a guardian had wholly disappeared, by reason of the death of the surety and the administration of his estate. Proceedings were instituted by the clerk, under Section 3268, and an order entered by the court requiring a new bond and surety as a substitute for the old. The order of the court was within the contemplation and authority of Section 3268, and it was held that the undertaking of the new surety was as broad as the duties of the guardian. The fact, also, that the obligees in the bond were the beneficiaries of the estate of the deceased surety was an important consideration in that case. We hold, therefore, that the Bankers Surety Company was properly held liable for the dereliction of April 1, 1912.

IV. The dereliction as to the $237 loan occurred August 19, 1912, which was within the period covered by the suretyship of the defendant American Surety Company. At the expiration of the first year of its suretyship, it also resorted to formal proceedings with a view of terminating its liability, and it obtained a formal order from the court to that effect. If the question turned upon the mere form of the order entered by the court, this appellant could perhaps be said to present a somewhat stronger defense of absolution than the Bankers Surety Company. Much of what we have said in the preceding division, however, is applicable here. As already indicated, the method of procedure and the rights accruing therefrom to the surety company are

determined by the express provisions of the statute, and the form of the final order is not very material. While the order relied upon by this appellant is quite sweeping in form, it is, nevertheless, consistent with the statutory provisions, and it should be so construed. It follows, therefore, that the American Surety Company was properly held as liable for the dereliction occurring during the period of its suretyship and joint control. The loss of $237 resulting therefrom, together with the interest thereon, was properly charged against it as a surety.

V.   As among the three sureties, the trial court held that each surety was primarily liable for the dereliction occurring during the period of its suretyship and secondarily liable for all previous derelictions. That is to say, the

5. GUARDIAN AND WARD: bonds: secondary liability of succeeding sureties.

American Surety Company is secondarily liable for the payment of the $1,800 loss in the event only that the Bankers Surety Company should fail to respond; and the Lion Bonding & Surety Company is liable for both losses secondarily, in the event of failure on the part of either or both of the other companies. We do not overlook the discussion in some of the briefs on this question of secondary liability of the later sureties. Upon the record before us, however, we have no occasion to pass upon the question of such secondary liability as between the sureties. The only parties adversely affected by such holding are the American Surety Company and the Lion Bonding & Surety Company. The latter company makes no objection to that feature of the order of the trial court. On the contrary, it concedes its propriety. The American Surety Company does not direct its complaints to that feature of the order. We assume that the various companies are deemed solvent, and the question of secondary liability is, therefore, of minor importance to them. We have no occasion, therefore, to give any consideration to that question.

VI.   The trial court taxed the costs equally among the three surety companies. The Lion Bonding & Surety Com-

pany contends that no costs·ought to have been taxed against it.  The holding of the trial court was not

6. Costs: taxation: taxation to successful party.

adverse to it upon any contention made by it. The only order of the trial court which could be said to be adverse to it was the order as to its secondary liability, as above stated.  It has not contested such secondary liability.  We are unable to see from the record why it should have been taxed with costs.  In that respect, there will be a modification of the order entered below, and such appellant will be relieved of liability for costs.  It will be the order that the costs of the trial court be taxed equally to the other two surety companies; likewise, the costs in this court, except that there shall not be taxed in favor of the Des Moines Savings Bank the costs of printing so much of its briefs as pertain to its own cross-appeal.  Except as herein modified, the order entered below will be affirmed.—*Modified* and *Affirmed.*

LADD, GAYNOR and SALINGER, JJ., concur.