IN RE GUARDIANSHIP OF W. E. BRICE.

No. 46134.

184

APRIL 6, 1943.

Smith & Beck, of Mason City, for Floyd E. Johnson, guardian, appellant.

Ralph S. Stanbery, of Mason City, and H. J. Ferguson, of Tama, for Brice L. Clutier, claimant, appellee.

GARFIELD, C. J.—Brice L. Clutier filed an application in probate alleging that he is a nephew and the only prospective direct heir of W. E. Brice, the incompetent ward; he is incapacitated, because of illness, from obtaining employment; he has no income or other means of support for himself and his wife; his wife is seriously ill and unable to earn; for the last ten years during which W. E. Brice was competent he took great interest in applicant and his family and voluntarily paid the rent on the apartment occupied by them in Chicago and otherwise supported them; such contributions by Brice continued up to the time he became insane; prior to his incompetency Brice had declared his intention to furnish such support and, if now sane, would be furnishing at least $250 a month for such purpose. The applicant prayed that the guardian be authorized to pay him $250 per month.

The guardian's answer denied the statements of the application and denied that the court had power to make any such order. Following a hearing at which evidence was offered in support of the application, the court ordered the guardian to pay the applicant for the care and support of himself and family $250 per month until further order of the court. The guardian has appealed.

There is practically no conflict in the evidence. W. E. Brice,

then about eighty-one, a man of large means, was adjudged incompetent and appellant was appointed his guardian on January 11, 1941. He has been a patient in a Mason City hospital since September 1940. His attending physician expressed the opinion that his mental incapacity would never improve. The ward is a widower without dependents. He had no children, no brothers, and but one sister, the mother of Brice L. Clutier, the applicant. This sister died in 1915, leaving the applicant, and another son who died in 1920 without having married. The guardian is apparently a responsible and careful business man who was employed by the ward for thirty-five years and was intimately acquainted with his affairs. He was unable to find any will made by Brice.

The applicant is fifty-three. His father, past seventy-six, is employed in a small way by a Chicago bank at $125 a month. The father has no money or property but has contributed from his earnings a dollar a day for the support of applicant and his wife. Formerly, the father had been associated with W. E. Brice as a typist and "errand boy." The applicant has a married daughter who is unable to contribute to the support of her parents. The applicant had been associated for a time with his uncle as a companion and helper, but received no definite pay. The applicant's health is poor and his wife is an invalid. He is the victim of fainting spells. He is a veteran of World War I. He has been able to do only about four months' work in the last ten years during which his total earnings have been $900 to $1,000. In that period his hospital and doctor bills have totaled about $3,600.

A lady who was employed by Mr. Brice for many years as his secretary testified, in substance, that he would always say, "I have Brice [the applicant] on my hands from now on"; he was not complaining, but that was his customary remark; that her employer very often spoke of his affection for the applicant's daughter and sent her money. Since March 1926, Brice frequently sent money to the applicant, usually in amounts from $50 to $100, but sometimes as much as $150 to $200.

Checks were found, payable to the applicant personally, made during the last nine years of the ward's sanity, to the

total average amount of $872 per year. There were other checks payable to the applicant's father and daughter, apparently for the benefit of the applicant and his family, and substantial sums were sent by Mr. Brice to his nephew by money order and telegraph. The total amount of these payments does not appear but a finding would be warranted that it is much larger than the amount of checks payable to the applicant. The guardian testified that Brice said many times that he intended to take care of his nephew as long as he needed assistance; that he felt it his duty to do so.

The personal estate of the ward was appraised at $1,104,825. This did not include the real estate. When the guardian was appointed in January 1941, there was on hand cash of about $255,000 which was used on December 4, 1941, to purchase United States treasury bills. The gross earned income for 1941 was $49,693.50. An allowance of $1,500 per month has been made for the support and maintenance of the ward and the upkeep of his home and office.

■ I. The guardian's first contention is that the order of allowance amounts to the taking of the ward's property without his consent, in violation of the due-process provisions of the Federal and State Constitutions (section 1, Fourteenth Amendment, Constitution of the United States, section 9, Article I, Iowa Constitution) and section 1, Article I, Iowa Constitution. It is sufficient answer that no such contention was made in the court below. Constitutional questions cannot be raised for the first time upon appeal. Martin Bros. Co. v. Fritz, 228 Iowa 482, 492, 292 N. W. 143, and cases cited; New York Life Ins. Co. v. Breen, 227 Iowa 738, 750, 289 N. W. 16, and cases cited.

■ II. It is next argued that the court had no power under the statutes to make the order of allowance.

The question involved upon this appeal has never been passed upon by this court. However, there is considerable outside authority to the effect that courts have wide powers in directing the management of an incompetent's estate and in a proper case may authorize an allowance to one to whom the ward owes no legal duty to support. In such matters the court may direct that to be done which the incompetent, if sane, would probably have done. The power of the court in such matters

has been likened to its right to authorize donations by a guardian for charitable purposes to which the incompetent had formerly been in the habit of making contributions. Some of these authorities are Woerner on Guardianship 457; Shelford on Lunatics, 2d Ed. 205; Buswell on Insanity, 120–123, sections 103, 104; 25 Am. Jur. 52, section 79; 32 C. J. 708, section 438; In re Flagler, 248 N. Y. 415, 162 N. E. 471, 59 A. L. R. 649, and annotation 653; Potter v. Berry, 53 N. J. Eq. 151, 32 A. 259, 34 L. R. A. 297, and annotation, 51 Am. St. Rep. 626; Farwell v. Commissioner, 2 Cir., N. Y., 38 F. 2d 791; Sheneman v. Manring, 152 Kan. 780, 107 P. 2d 741; Citizens State Bank v. Shanklin, 174 Mo. App. 639, 161 S. W. 341; Hambleton's Appeal, 102 Pa. St. 50.

In determining whether the incompetent, if sane, would contribute to the support of a relative to whom he owes no duty of support, the court will consider the needs of the relative, the relationship and intimacy which he bore to the incompetent prior to the adjudication of incapacity, the present and probable future requirements of the incompetent himself, whether others are dependent upon him for support and the extent of such dependency, the size and condition of the estate—giving to these and any other pertinent matters such weight as the incompetent, if sane, probably would have given. In re Fleming's Estate, 173 Misc. 851, 19 N. Y. S. 2d 234, 236, and cases cited.

While courts should act cautiously in making an allowance to one whom the incompetent is under no legal duty to support, having in mind at all times the welfare of the ward, this case seems properly to fall within the rule of these authorities. The ward, now over eighty-two and without dependents, appears to be incurably insane. So far as possible, all his needs and comforts are provided for. The estate is well in excess of a million dollars. The applicant is destitute. He and his wife are unable to work. The trial court found that the incompetent, in all probability, if sane, would provide for the support of the applicant and his family. There is ample evidence to support the finding. This is a probate matter not triable de novo here. In re Estate of Hale, 231 Iowa 1018, 2 N. W. 2d 775, 779, and cases cited.

The probate court had full jurisdiction of the estate of this ward. The property was in custodia legis subject to the orders of the court. Haradon v. Boardman & Cartwright, 229 Iowa 540, 546, 294 N. W. 770. We think there is statutory authority for the making of the order. Section 12581, Code, 1939, made applicable to such a guardianship as this by section 12613, provides:

"Guardians * * * must prosecute and defend for their wards, may employ counsel therefor, lease lands, loan money, and in all other respects manage their affairs, under proper orders of the court or a judge thereof."

We have frequently recognized that this statute is the important broad provision governing the powers and duties of a guardian to act under the supervision of the probate court. Speaking of substantially the same provision as section 12581 (section 2250, Code, 1873), it is said, in Bates v. Dunham, 58 Iowa 308, 310, 12 N. W. 309, 310:

"The powers which the guardians of property possess are conferred in section 2250."

It is our duty, by express legislative command, to construe this statute liberally, "with a view to promote its objects and assist the parties in obtaining justice." Section 64, Code, 1939.

We have held that the purchase of real estate with funds belonging to the ward amounts to the management of the ward's estate. Kowalke v. Evernham, 210 Iowa 1270, 1274, 232 N. W. 670. Also that the court has the power to order a guardian to purchase real estate with funds of the ward. In re Estate of Wisner, 145 Iowa 151, 153, 123 N. W. 978. We have also held that, even in determining the *nature* and *scope* of the expenditures of a guardian which may be properly approved, the court is vested with considerable discretion. Des Moines Sav. Bk. v. Krell, 176 Iowa 437, 441, 442, 156 N. W. 858; In re Guardianship of Fish, 220 Iowa 1328, 1333, 264 N. W. 542. We think the making of these payments to the applicant under the facts shown here, as authorized by this order of the probate court, properly falls within the management of the ward's affairs.

III. The guardian also contends that the order was not justified under the evidence, even assuming the power of the court to make it. It is argued that it does not sufficiently appear that the incompetent, if sane, would probably have contributed as much as $250 a month for the applicant's support. It is true the evidence does not disclose the exact amount contributed by Mr. Brice while sane for the support of the applicant and his family. And there is no way of knowing just how much the ward would now contribute if insanity had not overtaken him. However, if the probate court had authority to act in the matter, it had at least some discretion in determining the amount to be paid. The order is effective only until the further order of the court. We are not prepared to hold under the record that there was an abuse of discretion.

IV. It is contended the court erred in that it does not appear that these payments can be made out of the surplus income from the estate but that resort to the principal may be necessary.

In most of the cases where allowances from guardianship funds have been authorized for the support of one whom there is no legal duty to support it is probably true that the payments could be made from surplus income. The more recent authorities, however, apparently do not limit the payments which may be authorized to those that can be made out of surplus income. The controlling principle is that the court will act with reference to the incompetent and for his benefit as he would probably have acted if sane. In re Fleming's Estate, 173 Misc. 851, 19 N. Y. S. 2d 234, holds that such payments may be made even though resort to the principal is necessary. However, payments to one holding no legal obligation against the incompetent should not be authorized unless adequate provision has first been made for the ward.

We find it unnecessary to determine whether such an allowance should be made out of the principal of the ward's estate. It is probable that these payments can be made out of the surplus income without resort to the principal. In any event, it is certain that neither the ward nor his large estate will ever suffer because of these comparatively small payments.

190

This case was tried in April 1942, after the guardianship had been in effect a little more than fifteen months. As stated, the income from the estate for the first year was nearly $50,000. And about $255,000 in cash, or nearly one fourth the personal estate, seems to have been uninvested until December 4, 1941, when United States treasury bills were purchased at a price yielding but $^{15}\!/_{100}$ of one per cent. Such large nonrecurring expenditures were made during the first year that it is hard to ascertain just what the net surplus income was in 1941 or will be in the future. But it will be surprising if there is not sufficient income left from this estate of well over $1,000,000, after supplying the wants of this insane man and paying taxes and expenses of the guardianship, to make these payments to the applicant without resort to the principal.

V. The court allowed the applicant $50 to cover the expense of himself and wife in attending the hearing. They live in Chicago. The guardian attacks this provision of the order because the application did not specifically ask for such relief. The application did ask that the costs of the hearing be paid by the guardian. We are cited to cases holding that a judgment cannot be rendered for an amount greater than asked in the petition. We are not disposed to hold, on the ground that the prayer of the application did not specifically ask therefor, that this allowance of expense money was improper. Sufficient basis for our conclusion is that the technical rules of pleading are not strictly applied in a probate matter such as this. Soppe v. Soppe, 232 Iowa 1293, 8 N. W. 2d 243, 245, and cases cited.

The order is—Affirmed.

BLISS, OLIVER, HALE, and MULRONEY, JJ., concur.

WENNERSTRUM, MILLER, SMITH, and MANTZ, JJ., dissent.

WENNERSTRUM, J. (dissenting)—I do not approve of the conclusions reached in the majority opinion and the pronouncements therein made, and therefore respectfully dissent. The filing of a dissent, in the main, is a futile judicial effort. However, justification for the submission of a dissent may be found in one of the following reasons: It often gives the writer an

opportunity to use material intended for inclusion in a majority opinion, garnered from sources that were considered authorities prior to the time the majority opinion was filed; it also gives the dissenter an opportunity to publicly indicate that he is not disposed to let go unchallenged the statements expressed by the majority; it frequently permits a dissenter a chance to express his disapproval of judicial legislation; and, finally, it affords a means of presenting authorities that support the writer's views. Whatever may be the justification for this particular dissent, the following comments in support of it are respectfully submitted:

The majority opinion, by inference at least, admits that the basis of the order which it approves is by reason of the statutory authority given by section 12581, 1939 Code, which by reason of section 12613 is applicable to the present situation. This inferential admission indicates that the majority are of the opinion that there must be some statutory authority for the court to authorize that certain acts be done by the guardian.

The majority opinion cites the case of Bates v. Dunham, 58 Iowa 308, 310, 12 N. W. 309, 310, but does not set out an important statement in that opinion. Prior to the part quoted in the majority opinion from this last-cited case it is stated:

"We are of the opinion that section 2250 of the Code modifies the common law rule as to the power of a guardian over the property of his wards."

It will be thus observed that in this early case this court held that guardianship proceedings are subject to statutory control. It is suggested that section 64, 1939 Code, gives authority for the liberal construction of our statutes. It is true that this section does provide that the provisions of the Code "* * * shall be liberally construed with a view to promote its objects and assist the parties in obtaining justice." But no solace can be taken from that section if there is no statutory authority authorizing an act. It is said, in the case of Rural Ind. Sch. Dist. v. McCracken, 212 Iowa 1114, 1126, 233 N. W. 147, 153:

"A statute cannot be extended by construction so as to cover a *casus omissus*, as recognized and claimed by the instant plaintiff."

It was further said, in the case of Iowa-Des Moines Nat. Bk. & Tr. Co. v. Alta Casa Inv. Co., 222 Iowa 712, 715, 269 N. W. 798, 800:

"* * * and this court cannot put something into the statute which it does not contain."

It must be admitted that any statutory authority for the act which the majority opinion approves comes from the provision in section 12581 of the Code in which it states, in relation to the powers of the guardian, that "guardians * * * must * * * in all other respects manage their [minors'] affairs, under the proper orders of the court or a judge thereof."

The majority opinion has overlooked the fact that this particular portion of the quoted Code section has heretofore been passed upon by this court in the case of Andrew v. Sac County State Bank, 205 Iowa 1248, 1255, 1256, 218 N. W. 24. This court therein adopted the definition of the word "manage" taken from Webster's International Dictionary, as follows: "To direct affairs; to carry on business or affairs; to administer; also, to admit of being carried on." In this same citation 38 C. J. 523 is quoted, as follows: "To manage money is to employ or invest it."

In the case of In re Guardianship of Nolan, 216 Iowa 903, 249 N. W. 648, it is held that the statute in relation to the investment of funds of a guardian must be followed.

This court in the case of Easton v. Somerville, 111 Iowa 164, 172, 82 N. W. 475, 478, 82 Am. St. Rep. 502, in commenting upon the powers of a guardian, stated:

"A guardian cannot, as at common law, loan his ward's money, or invest it in securities, without an order of court. His powers are conferred by statute, and he may loan their money, and in all other respects manage their affairs, under proper orders of the court, or a judge thereof. Code, section 3200."

In connection with the consideration of Code section 3200 [Code, 1897], which is now incorporated in Code section 12581, we said, in the case of McIntire v. Bailey, 133 Iowa 418, 422, 110 N. W. 588, 590:

"In the absence of statute it is the duty of a guardian to keep his ward's money and property separate from his own; to keep an account thereof; to make investments, not in his own name, but as guardian; and to keep those investments separate from his own. These duties are so well understood that we need not cite authorities, in their support."

In considering the question of the propriety and legality of the order approved by the majority we can well give consideration to the prior statements of this court as to the purpose of a guardianship.

In the case of Zander v. Cahow, 200 Iowa 1258, 1264, 206 N. W. 90, 93, in commenting upon the purposes of a guardianship wherein the question of the necessity of appointing a guardian was in question, this court said:

"* * * the object of guardianship is to conserve the property for the owner * * *."

See, also, Huffman v. Beamar, 198 Iowa 1113, 197 N. W. 476; Perry v. Roberts, 206 Iowa 303, 308, 220 N. W. 85.

The majority opinion cites as authority the case of Kowalke v. Evernham, 210 Iowa 1270, 1274, 232 N. W. 670. A review of this case shows that under the statute at the time it was considered this court might have approved the investment of funds in regard to the estate. In the present case we are not concerned with the investment of funds of the ward's estate but are authorizing the expenditure of money without statutory authority. A further claimed authority on the part of the majority is In re Estate of Wisner, 145 Iowa 151, 153, 123 N. W. 978. This is another case in which the court approved the investment of the guardian's funds in real estate. Inasmuch as it had been previously approved and directed by a prior order of court, this action was perhaps justifiable under the general powers of management and would come under the classification of an investment. Other authorities cited by the majority opinion are Des Moines Sav. Bk. v. Krell, 176 Iowa 437, 441, 442, 156 N. W. 858, and In re Guardianship of Fish, 220 Iowa 1328, 1334, 264 N. W. 542. A review of these cases shows that the expenditures there approved were in the interest of the wards.

The allowance approved in the majority opinion is not in the interest of the ward, and to say that it is justified under the statutory authorization of the power "to manage" gives elasticity to the words that will surprise even a liberal-minded lexicographer.

It seems quite apparent that the legislature has indicated the scope of expenditures that might be made by a guardian for the care of individuals. This is evidenced by section 12628 of the 1939 Code, which is as follows:

"Sale or mortgage of real estate. Whenever the sale or mortgage of the real estate of such ward is necessary for his support, or for the support of his family, or the payment of his debts, or will be for the interest of the estate or his children, the guardian may sell or mortgage the same, including the homestead under like proceedings as required by law to authorize the sale of real estate by the guardian of the minor."

A further section that definitely indicates the legislative limitation of the expenditure of the ward's funds for the support of individuals is found in section 12629 of the 1939 Code of Iowa, which is as follows:

"Allowance to family. The court shall, if necessary, set off to the wife and minor children of the insane person, or to either, sufficient of his property, of such kind as it shall deem appropriate, to support them during the period such person is insane."

If the legislature desires to broaden the nature of the expenditures that may be made from a ward's estate, I feel that it is the prerogative and duty of that body to say so rather than have this court, by judicial pronouncement, judicially legislate as has been done by the majority opinion.

Heretofore it had been my understanding that the trial court, as well as this court, was bound by the limitations of statutory authority in connection with probate matters. In the case of Young v. Gammel, 1854, 4 (G. Greene) Iowa 207, 211, this court, in commenting upon the rights of a minor, said:

"In contemplation of law they could neither do nor suffer

to be done anything, as of contract, so as to dispose of their right to the estate or the use of it, without the interposing power of the proper court, in accordance with law."

A further evidence of the fact that the probate court heretofore has been limited in its authority to that given by statute is evidenced by the case of Dutch v. Marvin, 1887, 72 Iowa 663, 664, 665, 666, 34 N. W. 465, 466. In this case plaintiff was guardian of her husband, who was insane. She made application to the district court for an allowance out of the guardian's estate for the support of herself and her minor children. Intervener, a creditor, resisted the application. In this case reference is made to particular Code sections then in force. This court therein said, in part:

"The right created by section 2375, by the express terms of that section, is for the benefit of the widow and children of the decedent. The section creates a right in their favor after the death of the husband and father; the right being to a support for a limited period out of the estate. In the absence of such provision, their right to a support would terminate at his death; and the property, unincumbered by any claim by them for support, would take the course of descent prescribed by the law. The section is a special provision, applicable, by its terms, to particular cases; and the benefits created by it cannot be extended to other classes than those enumerated in it, except by special enactment or necessary implication. And we think that section 2278 does not have the effect to confer the same right upon the wife and children of an insane ward. That section is remedial in its character; that is, it points out the mode or manner in which the estate of the ward, when insolvent, shall be settled. But neither by its express provisions, nor by any necessary implication, does it create or confer any rights upon the family of the ward. The courts cannot, by mere inference from the general policy of the statutes of the state, create rights in their favor; but the legislature must be presumed to have enumerated all that was intended to be created or conferred. If cases of special hardship are liable to arise under the statutes as they now exist, the remedy must be provided by the legislature; the courts cannot create such remedy."

A further authority to this same effect is found in Ratcliff v. Davis, 64 Iowa 467, 468, 469, 20 N. W. 763, wherein this court, in commenting upon the right of a guardian to waive the homestead rights of his ward, said:

"It is claimed by her guardian that, because she is incapable of making her wishes known, his preference shall be substituted for hers, and that he can waive the statutory provisions. We do not think he has any power to do so, because, as it appears to us, the right is a personal one, and, if not exercised for any reason, even though it be her incapacity to do so, no other person can act in that behalf in her stead."

See, also, Singleton v. National Land Co., 183 Iowa 1108, 167 N. W. 97.

It has heretofore been my belief that the guardian of a ward is a conservator of the ward's estate, and that guardianship proceedings anticipated that the guardian would preserve the estate. It has been my further belief that the statute heretofore limited the expenditures to the members of the ward's family, but with the holding of the majority opinion it is apparent that that is not now the law.

In connection with the allowance made to the applicant, it should be kept in mind that if this applicant had sought to require his uncle to support him while the present ward was sane and the uncle had refused there would have been no statutory authority that would have required it. Code section 3828.074, 1939 Code, limits the liability of the support of any poor person to parents and children; and Code section 3828.077 to grandparents and male grandchildren. It is difficult to understand by what reasoning the court can say that a ward's estate can be required to support an individual when that support could not be enforced if the person under guardianship were sane.

In connection with the administration of estates of decedents, this court has on numerous occasions held that their administration is a matter of statutory enactment. In the case of In re Estate of Rugh, 211 Iowa 722, 724, 234 N. W. 278, 279, we said:

"The administration of the estate of a decedent within this state is solely a matter of statutory enactment."

In In re Estate of Harsh, 207 Iowa 84, 87, 218 N. W. 537, 539, this court said:

"Administration of estates of deceased persons is undertaken by the state through its courts, and pursuant to its statutes. The administrator is the officer of the law and of the court, and conducts the administration pursuant to the provisions of the statutes, under the court's authority and supervision."

Numerous authorities, holding to the effect that the probate court in the administration of estates is limited to the authority given by statute, can be cited. I do not quote from them because to do so would unnecessarily lengthen this dissent, but reference is here made to the following cases: Valley National Bank v. Crosby, 108 Iowa 651, 653, 655, 79 N. W. 383; McFarland v. Howell, 162 Iowa 110, 117, 143 N. W. 860; In re Estate of Munger, 168 Iowa 372, 375, 150 N. W. 447, Ann. Cas. 1917B, 213; In re Estate of Collicott, 226 Iowa 106, 111, 283 N. W. 869; Bookhart v. Younglove, 207 Iowa 800, 218 N. W. 533.

If, in the administration of estates of decedents, we have held that the authority for administration is a matter of statutory enactment, it would seem that we should follow that practice in connection with the administration of guardianship estates. This is particularly true when we consider that the real purpose of a guardianship is to preserve and conserve the ward's estate.

The majority opinion does not state that the theory as to an allowance such as is approved. by it was first announced by Lord Eldon, Chancellor, speaking for the Chancery Court in the case of Ex parte Whitbread, 1816, 2 Mer. 97. This last-cited case was followed by a further English Chancery case of In re Blair, 1836, 1 Myl. & C. 300, 303. In this case Lord Cottenham, Chancellor, in commenting upon an authorization of an allowance to a nephew of a lunatic, said:

"The practice, however, was one which could not be regarded with too much caution, and the principle involved in it

ought to be narrowed rather than extended in its operation; and his Lordship desired that it might be understood, that he would never exercise such a jurisdiction without the greatest possible jealousy and caution. As however, the principle had been so far followed, and as there seemed no probability that the lunatic would recover, or would be capable of greater enjoyments than those which were now afforded to her, his Lordship would, in the present instance, make the order.''

In the adoption of the majority opinion we have an opportunity to observe how precedents grow and attach themselves to our judicial system despite the belief that laws are enacted by legislatures and that courts should interpret them. A review of the several cases that have approved of an allowance such as is permitted in the instant case shows that it was usually a chancery court that authorized it. This is true as to virtually all the English cases that have been brought to my attention.

The majority opinion cites, as authority for its holding, Woerner on Guardians, 1897, 457; Shelford on Lunatics, 1847, 2d Ed. 205; Buswell on Insanity, 1885, 120, 123, sections 103, 104. A study of these authorities shows that the writer of the particular text merely set forth the prior pronouncements of the English chancery courts. In 25 Am. Jur. 52, section 79, cited as authority by the majority, it is stated:

''Also, a court of equity has power out of the surplus income of the estate of an insane person to provide for the support of persons whom the insane person is not under legal obligation to support, where it specifically appears that the insane person himself would have provided for such support had he been sane.''

The cited authorities for this last-quoted statement are, in the main, shown to be the pronouncements of equity courts.

The case of Sheneman v. Manring, 152 Kan. 780, 107 P. 2d 741, holds that an allowance to an indigent daughter of an insane ward was proper. Such would have been the holding in Iowa, under our statutory authority. It is difficult to see in what way this case can be held as authority for the majority opinion.

The other cases cited by the majority as authority for the allowance approved by it give some support to their holding. None of these cases sets forth the statutory authority for the approval of the allowance. In virtually each instance the early English chancery cases are cited as precedent. As previously stated, thus do precedents develop despite the fact that Lord Cottenham, Chancellor, in the case of In re Blair, supra, said that allowances of the character he approved "could not be regarded with too much caution."

By the majority opinion we are establishing a precedent for large guardianship estates and small ones. It will be followed despite the size of the ward's estate. It is a precedent that is established without definite statutory authority. I cannot approve of such judicial legislation. I believe I am just as sympathetic in regard to the welfare of the applicant for the allowance as are the members of the court that approve the majority opinion. But precedents should not be established because of sympathetic motives. I regret the length of this dissent but I am concerned because of the tendency of courts to assume the prerogatives and duties of the legislature. I would reverse.

I am authorized to state that SMITH, MANTZ, and MILLER, JJ., join in this dissent.